IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HEATHER K. MYERS,            *

    Plaintiff,                *

       v.                    *     Civil Action No. RDB 09-1633

THE CARROLL INDEPENDENT,    *
FUEL CO., *et al.*,
                                  *

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

Plaintiff Heather K. Myers ("Myers") brings this action against Defendants The Carroll Independent Fuel Company ("Carroll") and its welfare benefits plan administrator, Willse and Associates, Inc. d/b/a NCAS ("NCAS"). In Count I, Myers contends that Defendant Carroll violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and Maryland's Fair Employment Practices Act, Art. 49B § 16(a)(1) ("FEPA"), when it retaliated against her after Myers engaged in protected activity by transferring her to a satellite office and ultimately terminating her employment. In Counts II and III, Myers contends that Defendants Carroll and NCAS are liable for failing to mail her timely notices of her right to continuing health care coverage under the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161 *et seq.* ("COBRA"), and her potential eligibility for a premium reduction under the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 (Feb. 17, 2009) ("ARRA"), as required by Section 606 of the Employee Retirement Income Security Act, 29 U.S.C. § 1166 ("ERISA"). Defendants have each filed motions for summary judgment. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendant Carroll's Motion for Summary Judgment

(ECF No. 30) and Defendant NCAS's Motion for Summary Judgment (ECF No. 29) are GRANTED.

## BACKGROUND

At summary judgment, this Court reviews the facts relating to this claim in the light most favorable to the non-moving party. *See, e.g., Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

### A.     Myers's Employment at Carroll

Plaintiff Heather Myers began working at Defendant The Carroll Independent Fuel Company as a tax accountant in 2003. Myers Dep. at 8. As a tax accountant, Myers was responsible for Carroll's tax billings, filings and reporting. *Id*. at 9-10. In or around December 2005, Myers began dating Carroll's Safety Director, Eric Baumgart. *Id*. at 13-15. Though both Myers and Baumgart worked at Carroll's "main office" in Loch Raven, Maryland, Myers and Baumgart worked in different departments and never worked together. *Id*. at 14-17, 28-29. According to Myers, her relationship with Baumgart began deteriorating in July 2006. *Id*. at 16. On October 12, 2006, Myers sent Baumgart a message through her work email account asking that he "leave her alone" and "stop harassing her." Carroll Summ. J. Mem. Ex. 3C. Myers forwarded this email to Lauren Shapiro, a member of Carroll's Human Resources department. Myers Dep. at 19. Though Myers later explained that she sent this email to Shapiro because they were friends, not because Shapiro worked for Human Resources, Shapiro reported the email to Carroll's Director of Human Resources, Jay Nappo. Carroll Summ. J. Mem. Ex. 3E.

After learning of Myers's email, Nappo and Paul Simon, Carroll's Chief Financial Officer, scheduled a meeting with Myers on October 16, 2006. Myers Dep. at 20. At the meeting, Myers explained that her email exchange with Baumgart was personal, she had not intended to report it to Human Resources, and did not "plan to involve [Carroll] in any legalities in regard's [sic] to my personal life." Carroll Summ. J. Mem. Ex. 3D. Nonetheless, Simon

2

expressed to Myers that Human Resources had pulled Baumgart's work phone records, and that they were alarmed at the excessive number of phone calls Baumgart made to Myers on Carroll's phone system—an average of 42 times a day. Myers Dep. at 20-21. "In an effort to protect the company from any possible liability" Baumgart was subsequently disciplined "several times" about using Carroll equipment to contact Myers for personal reasons. *Id*.; Jay Nappo Aff. ¶ 5. Myers was not disciplined during or after the meeting with Human Resources. *Id*.

Myers and Baumgart's relationship continued for some months, but Myers appears to have ended the relationship for good on March 7, 2007. Carroll Summ. J. Mem. Ex. 3F. Later that same day, Myers volunteered at Carroll's annual charity golf tournament. Myers Dep. at 145. At the tournament, several Carroll employees saw Baumgart approach Myers on numerous occasions. *Id*. Some of these employees reported Baumgart's conduct to Jay Nappo the next day, who then began an investigation into Baumgart's conduct. *Id*. After speaking with Myers, Nappo determined that Baumgart would no longer be allowed to enter the building where Myers worked. *Id*. Nappo also suspended Baumgart from work for a week. Compl. ¶ 30. When Baumgart showed up to work despite his suspension, Nappo placed him on probation for six months. *Id*. ¶ 34. While on probation, Baumgart continued to use his Carroll-issued mobile phone to contact Myers on her work phone. *Id*.¶ 37. On June 17, 2007, Nappo terminated Baumgart because he continued to use Carroll's phone and email system to contact Myers. Nappo Aff. ¶ 6.

During the nine months following Baumgart's termination, Myers continued to work as a tax accountant at Carroll's main office in Loch Raven. Myers Dep. at 49-51. In March 2008, Myers was transferred to one of Carroll's satellite offices in Curtis Bay, Maryland.[1] *Id.* Myers's supervisor, Eric Devroye, states that Myers was transferred to that office because it housed the commercial sales staff, with whom she worked closely. Eric Devroye Aff. ¶ 3. At her

---

[1] This office is also referred to as Carroll's "Chemical Road" location. Eric Devroye Aff. ¶ 3.

deposition, Myers stated that she liked the Curtis Bay office, but that she felt isolated from her department. *Id*. at 49. As a result of her transfer, Myers no longer worked at the same location as Devroye and the majority of Carroll's accountants, though two other accounting employees, Derek Fritz and Sue Johnson, had been transferred to that office approximately one year earlier.[2] *Id.* at 50; Devroye Aff. ¶¶ 3-4. Myers also contends that as a result of her transfer she was excluded from certain meetings and computer training sessions. Myers Dep. at 52-57. Myers claims that as a result of missing these meetings, she did not hear about opportunities for promotions that she otherwise would have applied for. *Id*. at 60-64.

In January 2009, Carroll hired a new Chief Administrative Officer, Thomas Bristow ("Bristow") to handle some tax billing, accounting and filing problems. Bristow Aff. ¶¶ 2-3; Bristow Dep. at 11-12. Bristow previously worked as a consultant for Carroll in 2006 and 2007, during which time he had minimal interaction with Myers. *Id*. ¶ 1; Bristow Dep. at 6; Myers Dep. at 71-72. Myers stated at her deposition that she never discussed her relationship or problems with Baumgart when Bristow was a consultant, though she believes it was common knowledge at Carroll. Myers Dep. at 72. As Chief Administrative Officer, Bristow had oversight responsibility for Myers. Bristow Aff. ¶ 4. On or about January 15, 2009, Bristow asked Myers to move back to the main office in Loch Raven. Myers Dep. at 70. Shortly after Bristow began supervising Myers, however, he came to feel that there were serious problems with some of the tax filings Myers had handled for Carroll. Bristow Aff. ¶ 6. Bristow discovered, for example, that Myers failed to timely file a tax return for heavy use vehicles, which resulted in an assessment of a penalty fee against Carroll. *Id*. ¶ 8; Carroll Summ. J. Mem.

---

[2] Myers contends in her Opposition brief that she was the only accountant transferred to Curtis Bay. Opp'n to NCAS at 8. Though Fritz and Johnson did not work for Carroll Independent Fuel, but instead for the affiliated entity Carroll Branded Fuel, Myers worked with Fritz and Johnson and did the tax reporting for Carroll Branded Fuel. Myers Dep. at 49-50. Thus, even if Fritz and Johnson did not work in Myers's exact department, she was not the only accountant who worked in the Curtis Bay satellite office.

4

Ex. 2C. Bristow also ascertained that Myers had been improperly filing certain tax returns with the state of Delaware. Bristow Aff. ¶ 9. Bristow felt that Myers's mistakes demonstrated an inability to understand basic accounting principles, and thus Bristow determined that Myers was "grossly incompetent." *Id*.

On February 3, 2009, Bristow met with Myers to explain his concerns regarding her accounting mistakes and abilities. *Id*.; Bristow Dep. at 18. As a result of this meeting, Bristow decided to demote Myers without reducing her salary, and to reassign her core job responsibilities to a different employee. Bristow Dep. at 30-31. Over the next few days, however, Bristow observed Myers acting in what he considered to be an insubordinate fashion. *Id*. Specifically, Bristow was upset that Myers had attempted to produce documents showing that she had not made mistakes on Carroll's Delaware tax return, despite Bristow's explicit instructions that she take no further action on the issue. *Id*. at 33. As a result, Bristow decided to terminate Myers instead of merely demoting her because he "no longer trusted her as a resource." *Id*. at 27-28, 41.

On February 6, 2009, Bristow cleared his decision with Rick Phelps, one of Carroll's owners, and with Carroll's Human Resources department. *Id*. at 31-33. Later that day, Bristow met with Myers and explained that she was being terminated for poor performance and insubordination. *Id*. at 40-41. According to Bristow, Myers did not dispute her termination at this time or state that she felt she was being retaliated against. *Id*. at 41.

In June 2009, Rick Phelps contacted Eric Baumgart and eventually rehired him as a Safety Director. Baumgart Dep. at 49-50. According to Bristow, he played no role in the decision to rehire Baumgart, and learned about Baumgart's hiring through a company announcement. Bristow Aff. ¶ 16. In his affidavit, Bristow states that he did not know who Baumgart was at any point prior to terminating Myers. *Id*.

    **B.**    **COBRA and ARRA Notice Mailings**

Defendant NCAS is Carroll's claims administrator, and as such performs certain administrative services for Carroll, such as sending out COBRA election notices after an employee is terminated. *Id.* ¶ 5. On February 10, 2009, Carroll notified NCAS that Myers's last day of work was February 6, 2009, and that her last day of health care coverage would be February 28, 2009. Teresa Howard Decl. ¶ 7. On March 27, 2009, NCAS mailed via first class mail to Myers's residence a COBRA Continuing Coverage Election Notice and a notice explaining Myers's potential eligibility for a premium reduction under the American Recovery and Reinvestment Act of 2009. Carroll Summ. J. Mem. Ex. 7. Myers denies receiving the March 27, 2009 COBRA and ARRA notices, though she admits that she had experienced problems in the past with receiving mail at her home address. Myers Dep. at 172.

Defendants contend that the first time they heard that Myers had not received the March 27, 2009 COBRA and ARRA notices was when Myers filed this lawsuit on June 20, 2009. NCAS Summ. J. Mem. at 8. Accordingly, on July 20, 2009, NCAS mailed a second set of COBRA and ARRA notices to Myers's home address via the United Parcel Service ("UPS") and gave her an additional sixty days to retroactively elect COBRA coverage.[3] Carroll Summ. J. Mem. Ex. 8. On December 24, 2009, after becoming aware of an error in the second notice, NCAS mailed a third set of COBRA and ARRA notices to Myers's residence via UPS and gave her another sixty days to retroactively elect COBRA coverage. Carroll Summ. J. Mem. Ex. 9. Though Myers admits that she received this notice, she has never elected COBRA coverage. Howard Decl. ¶ 17.

---

[3] At her November 18, 2009 deposition, Myers acknowledged receiving this second COBRA notice, but explained that she did not choose to elect coverage at that time because she was confused about the deadline due to a typographical error in the notice. Myers Dep. at 180. The second COBRA notice stated that Myers had sixty days from the date of the notice to elect coverage, but indicated that the form had to be returned no later than July 11, 2009—i.e. nine days before it was mailed to her in the first place. Myers Dep. at 179-80. At her deposition, Myers explained that she was "too scared" to contact Carroll about the error, and never thought to contact NCAS to resolve the confusion. *Id.* at 181.

On June 20, 2009, Myers filed her Complaint alleging Carroll violated Title VII and the Maryland FEPA when it transferred her and ultimately terminated her in retaliation for engaging in protected activity (Count I), and that both Carroll and NCAS violated the notification requirements under ERISA § 606, 29 U.S.C. § 1166 by failing to send Myers a COBRA notice within thirty days of her termination, and by failing to send her an ARRA notice (Counts II and III). On March 30, 2010, Defendant NCAS moved for summary judgment. (ECF No. 29.) On March 31, 2010, Defendant Carroll moved for summary judgment. (ECF No. 30.)

STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373,

7

375 (D. Md. 2001) (citations omitted).

## ANALYSIS

### I. RETALIATION CLAIM (Count I)

Myers asserts that Carroll violated Title VII and the Maryland Fair Employment Practices Act by retaliating against her after she reported Eric Baumgart's harassment to Carroll's Human Resources department. Carroll contends that the majority of Myers's allegations relating to her retaliation claim are time-barred, and that the remainder of her allegations fail to state a *prima facie* case of retaliation. Carroll also maintains that it had legitimate, non-discriminatory reasons for transferring and ultimately terminating Myers, which she has not rebutted.

#### A. Timeliness

To bring a Title VII claim in federal court, "a plaintiff must first exhaust his administrative remedies by filing a charge of discrimination with the EEOC." *Edelman v. Lynchburg Coll.*, 228 F.3d 503, 506 (4th Cir. 2000). Under Title VII, such a claim must be filed with the EEOC within 180 days of the alleged misconduct. 42 U.S.C. § 2000e-5(e)(1). In a deferral state such as Maryland, this period is extended to 300 days in cases such as this, "when state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Williams v. Giant Food, Inc.*, 370 F.3d 423, 428 (4th Cir. 2004). As a result, "alleged discriminatory acts which occurred more than 300 days prior to the filing of the EEOC charge may not be subsequently challenged in a Title VII suit." *Van Slyke v. Northrop Grumman Corp.*, 115 F. Supp. 2d 587, 592 (D. Md. 2000). Here, Myers filed her EEOC charge on March 12, 2009. Thus, Myers's claims based on allegedly discriminatory acts occurring prior to May 16, 2008—300 days before she filed her EEOC charge—are time-barred and not properly before this Court. *See, e.g., Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997) ("[i]ncidents outside the statutory window are time-barred").

The vast majority of Myers's allegations relate to purported adverse actions that happened before May 16, 2008, and therefore are time-barred. In fact, the only allegations Myers makes pertaining to events that happened within the 300-day statutory window are that she 1) missed certain opportunities as the result of being transferred to the Curtis Bay office, and 2) was terminated for "pretextual" reasons on February 6, 2009.

First, Myers claims that she was transferred to Curtis Bay in March 2008 in retaliation for engaging in protected conduct. Though this allegation is untimely, Myers claims that as a result of her transfer, she:

- did not receive the same computer training as other accountants in August 2008. Myers Interrog. No. 7.

- was not included in certain accounting meetings and luncheons in or around August 2008. Myers Interrog. No. 8.

- was prevented from applying for a corporate controller promotion in May 2008 and an internal auditor position in January 2009. *Id*.

Myers appears to assert that because her original transfer was discriminatory, all of these perceived missed opportunities were the result of discrimination. This argument seems to enable Myers to improperly revive her untimely claim that her March 2008 transfer was discriminatory. Thus, these missed opportunity claims are time-barred. Nonetheless, this Court will consider in the alternative whether, assuming Myers intended to argue that her missed opportunities were the direct result of discrimination, these claims state a prima facie case of retaliation.

Second, Myers contends that she was terminated without warning for "pretextual" reasons on February 6, 2009. *Id*. ¶ 52. Given that Myers filed her EEOC charge just over a month after her termination, this allegation is timely. Thus, this Court must determine whether Myers's termination claim suffices to state a claim for retaliation under Title VII.

**B.    Prima Facie Case**

9

To make a *prima facie* showing of retaliation under the FEPA, Art. 49B § 16 (f),[4] and Title VII, § 2000e-3(a), an employee must show that (1) she engaged in a protected activity, (2) her employer took an employment action against her that a reasonable employee would have found materially adverse, and (3) there was a causal connection between the protected activity and the adverse employment action. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 298 (4th Cir. 2004) (federal law); *Martin Marietta Corp. v. Maryland Comm'n on Human Relations*, 38 F.3d 1392, 1402 (4th Cir. 1994) (Maryland law); *Bean v. UPS*, 2005 U.S. Dist. LEXIS 17225, at *17 (D. Md. Aug. 18, 2005) (citing *Chappell v. Southern Md. Hosp., Inc.*, 578 A.2d 766, 773 (Md. 1990) ("As [Art. 49B § 16(f)] tracks the language of § 2000e-3(a), we think it likely that these same criteria would determine whether a *prima facie* violation of the state law was established."). Carroll does not dispute that Myers engaged in protected activity when she told members of Carroll's Human Resources department about Baumgart's harassment of her, so the first prong of this test is met.

### 1. Missed Opportunities Resulting from Myers's Transfer

Carroll asserts that Myers's transfer from the main office in Loch Raven to Carroll's Curtis Bay did not result in adverse actions. Carroll also contends that there is no causal connection between Myers's protected activity the alleged adverse actions.

#### a. Adverse Actions

An adverse employment action is a discriminatory act which "adversely affects 'the terms, conditions, or benefits' of the plaintiff's employment." *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001) (quoting *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 243 (4th Cir. 1997)). As the United States Court of Appeals for the Fourth Circuit has explained, "[t]he mere fact that a new job assignment is less appealing to the employee . . . does not

---

[4] Myers does not refer to section 16(f) in her complaint, but it is the only section of Article 49B providing a cause of action for retaliation.

constitute adverse employment action." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (citing *Von Gunten*, 243 F.3d at 868). Thus, "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action." *Id*. at 376 (quoting *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999).

Myers does not dispute that after her transfer, she retained her position, received the same pay, and kept the same benefits. Myers emphasizes, though, that "her conditions of employment materially changed" when Carroll transferred her to Curtis Bay because she became excluded from certain computer training sessions and meetings, Summ. J. Mem. Ex. 1 at 50-54, and as a result "was not given the knowledge—hence the opportunity" to apply for certain promotions. Myers Opp'n to Carroll Summ. J. Mem. at 9-10.

First, Myers's claims that she did not receive training on Carroll's new computer system in August 2008, and that after August 8, 2008, she was "excluded from certain meetings regarding taxes, which was essentially my job," are vague and unsupported by the record. Myers Interrog. Nos. 5, 7. In her deposition, Myers fails to provide any credible detail about how missing these meetings or training sessions affected her ability to do her job. Myers Dep. at 54-56. Carroll, on the other hand, has produced numerous emails demonstrating that Myers was regularly included on accounting meetings during this time period, attended at least one training session on Carroll's new computer system in September 2007, and was informed about other training opportunities as well. Carroll Summ. J. Mem. Exs. 4A-4F. Absent some evidentiary support, Myers's claims fail to establish that her transfer was an adverse action. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (finding that plaintiff's claim that he was excluded from "important meetings" lacks specificity and did not justify finding that his work reassignment constituted an adverse action).

Second, Myers's claims that she lost opportunities for promotion have no basis in the

record. Myers admits she would not have applied for the corporate controller promotion in May 2008, Myers Dep. at 64, and that she is not sure whether she would have applied to the open internal auditor position that was filled in January 2009. *Id.* at 65. Thus, Myers fails to show that the opportunities she missed while working at the Curtis Bay office constitute adverse actions.

      **b.**      **Causal Connection**

Even assuming that Myers's missed opportunities were adverse actions, Carroll asserts that there is no causal link between Myers's protected activity and the adverse actions. Carroll has presented evidence that it was looking to fill the internal auditor position—the one position Myers "might" have applied for—outside of the company, and did so when it hired Virginia Sly. Carroll Summ. J. Mem. Ex. 2 ¶ 3; 3G. It is also worth noting that the last time Myers spoke to Human Resources about Baumgart was in June 2007, when Carroll terminated him. Myers Dep. at 150-52. Yet, the promotions and meetings Myers alleges she was denied after being transferred to the Curtis Bay office occurred over nine months later. The lengthy period of time between when Myers engaged in protected activity and when the alleged adverse actions took place weighs against finding a causal connection between the two. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" must be "very close" in order to serve, without more, as "sufficient evidence of causality"); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 Fed. Appx. 229, 233 (4th Cir. 2006) (noting that three to four months between an adverse action and protected activities weighs against finding a causal connection). Accordingly, Myers's allegations as to these missed meetings and opportunities do not establish a *prima facie* case of retaliation.

      **2.**      **Termination**

Carroll argues that Myers has failed to state a *prima facie* case that she was terminated in retaliation for engaging in protected activity because she has not shown a causal connection between her complaints to Human Resources and her termination.

Myers contends that: "there is a causal connect[ion] to her discharge—the return of Eric Baumgart." Opp'n to Carroll Summ. J. Mem. at 12. Though Carroll's decision to rehire Baumgart after terminating Myers is curious, there is no evidence that Thomas Bristow, who made the decision to terminate Myers, knew who Baumgart was before making his decision. Bristow Aff. ¶ 16. Myers contends that Bristow decided to terminate her only after being informed about Baumgart by Rick Phelps, who "knew about Myers' [sic] protected activity and had an interest in bringing Baumgart back to [Carroll]." Opp'n to Carroll Summ. J. Mem. at 6. Yet, there is no evidence that Phelps told Bristow about Myers and Baumgart's history at any point before Myers's termination, or that Phelps influenced Bristow's decision to terminate Myers. Bristow Dep. at 46-48. Bristow also played no role in rehiring Baumgart, and did not know that Baumgart had been rehired until he heard about it through a company-wide announcement. Bristow Aff. ¶ 16. Furthermore, twenty months elapsed between when Myers last contacted Human Resources regarding Baumgart in June 2007 and when Bristow made the decision to terminate Myers in February 2009. This extensive period of time counsels against a finding of a causal connection. *Pascual*, 193 Fed. Appx. At 233; *Popo v. Giant Foods LLC*, No. WDQ-08-1190, 2009 WL 4908840,* 5 (D. Md. December 11, 2009) (four-month lapse between complaint and termination insufficient to establish a casual connection between the two events) (citing *Richmond v. ONEOK, Inc.*, 120 F. 3d 205, 209 (10th Cir. 1997) (three-month period insufficient)). Accordingly, Myers has not demonstrated that there was a causal connection between her protected activity and her termination.

    **C.**    **Legitimate, Non-Discriminatory Reasons for Transfer and Termination**

Carroll asserts that even if Myers establishes a *prima facie* case of retaliation, it had legitimate, non-discriminatory reasons for transferring her to the Curtis Bay office and for ultimately terminating Myers's employment, and that Myers cannot prove that these asserted motives were a mere pretext for retaliation.

Carroll's explanation that Myers was transferred to the Curtis Bay office because it housed the commercial sales staff, with whom Myers worked closely, is supported by the record. Devroye Aff. ¶ 3. Carroll also has produced evidence that Bristow terminated Myers because she had made numerous mistakes with respect to important tax filings—mistakes Myers admits to making—and because Bristow found Myers's refusal to take responsibility for her mistakes unacceptable. Bristow Aff. ¶ 5. Myers does not provide any credible evidence that Carroll's reasons for transferring and ultimately terminating her were a pretext for retaliation. Though Myers claims that the deposition of Tim Erwin, one of her former supervisors at Carroll, shows that "she was not responsible for the tax filings that she was accused of making errors on," Myers Opp'n to Carroll Summ. J. Mem. at 14, Erwin left Carroll in March 2008 and had no knowledge of Myers's performance at Carroll during the following year. Myers does not offer any other evidence to undercut Carroll's explanations for transferring and terminating her. As a result, Myers has not rebutted Carroll's legitimate, non-discriminatory reasons for transferring and terminating her.

In sum, the majority of Myers's allegations against Carroll are time-barred, and the remainder fail to state a *prima facie* case for retaliation. Even if Carroll's timely allegations established a *prima facie* case, Carroll has presented legitimate, non-discriminatory reasons for its actions. Accordingly, Carroll's motion for summary judgment as to Myers's retaliation claim (Count I) is granted.

## II.     ERISA VIOLATIONS (Counts II and III)

In her Complaint, Myers alleges that both defendants are liable for failing to send her timely notices under the Consolidated Omnibus Budget Reconciliation Act and the American Recovery and Reinvestment Act of 2009. In her Opposition, however, Myers concludes that "[b]ased on the discovery in this case, NCAS is solely responsible for sending out the COBRA notices." ECF No. 44 at 2, n. 1. Though Myers's Complaint brings separate claims against both defendants as to the COBRA and ARRA notices, Myers does not specifically reference the ARRA claim in her briefs. Instead, she appears to consider her claims pertaining to COBRA and the ARRA to be one and the same. Thus, Myers has dropped her ERISA claims against Carroll and brings them only against NCAS as the third party administrator of Carroll's benefits plan. As a result, this Court will address Myers's COBRA and ARRA claims only as to Defendant NCAS.[5]

**A.      COBRA Notice**

The Consolidated Omnibus Budget Reconciliation Act requires the plan sponsor of a group health plan to provide each qualified beneficiary who would lose coverage under the plan as a result of a "qualifying event" an option to continue coverage under the plan. 29 U.S.C. § 1161. A "qualifying event" includes termination of any employee other than for gross misconduct. 29 U.S.C. § 1163. Upon occurrence of the qualifying event, the employer "must notify the administrator . . . within 30 days . . . of the date of the qualifying event[.]" 29 U.S.C. § 1166(a)(2). The administrator then must notify, within 14 days of receiving the notification from the employer, any qualified beneficiary of his COBRA rights. 29 U.S.C. §§ 1166(a)(4)(A) & (c). If the employer is the plan administrator, the employer has a total of forty-four days to notify an employee. *See* 29 C.F.R. § 2590.606-4(b); *See Roberts v. National Health Corp.*, 963 F. Supp.

---

[5] As will be discussed below, Carroll is the plan administrator, and as such could be liable for violations of 29 U.S.C. § 1166. *See Cooper v. Harbour Inns of Balt., Inc.*, 2000 U.S. Dist. LEXIS 4284, at *19-20 (D. Md. Mar. 20, 2000) (finding plan administrator liable for failing to send timely COBRA notice the plaintiff).

15

512, 515 (D.S.C. 1997) ("Granting an employer/administrator forty-four days [from the date of the qualifying event] to deliver the COBRA notice will not harm the employee, because, were an employee to choose continuation coverage, the first premium would apply retroactively to provide continuous coverage from the date of the qualifying event."). Section 502(c) of ERISA, 29 U.S.C. § 1132(c), provides that if a group health plan administrator fails to provide the requisite COBRA notices, a court has the discretion to find the administrator personally liable to the participant for up to $110 per day from the date of failure until the date of correction. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1.

### 1. NCAS had Forty-Four Days to Send Myers's COBRA Notice

Myers contends that Defendant NCAS was obligated to send a COBRA notice to her within "thirty (30) days of her termination" from her employment at Carroll. Myers appears to support this contention with the argument that "the role of plan administrator appears to lie solely with NCAS." Myers's Opp'n to NCAS at 1. As defined in 29 U.S.C. § 1002(16), an "administrator" is a person so designated in the plan instrument, or the plan sponsor, or the designee of the Secretary of Labor. Carroll's Summary Plan Description unambiguously states that Defendant Carroll is the plan administrator. NCAS Summ. J. Mem., Ex. F. Furthermore, the service agreement between Carroll and NCAS explicitly refers to Carroll as the "plan sponsor" and states that NCAS only performs "administrative and claims processing services." *Id*., Ex. G. Thus, the language in the plan and in the service agreement supports NCAS's position that Carroll is the sole plan administrator.

Myers fails to cite any credible evidence in favor of her contention that NCAS acted as a plan administrator. Myers does not, for example, contend that NCAS played any role in determining claims for benefits. In fact, the only allegation Myers makes in support of her claim is that "[n]o one employed by Carroll is involved in the process of mailing COBRA notices." Myers Opp'n to NCAS at 3. The act of mailing COBRA notices, absent greater responsibilities

16

such as determining claims, is insufficient to transform a claims administrator into a plan administrator. *See, e.g.,Givens v. American Benefit Corp.*, 1993 U.S. App. LEXIS 11500, *7-9 (4th Cir. May 17, 1993) (company hired by plan to perform monthly billings, claims payments and actuarial consultation, and which made initial decisions on claims for benefits, was not ERISA fiduciary, since it performed only ministerial tasks, and final decisions and appeals were in hands of plan's trustees.); *Frye v. Metro. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 134565, at *41-42 (S.D. W. Va. Dec. 20, 2010) (holding that an insurer who administrates claims does not transform into a plan administrator for purposes of assessing civil penalties); *Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 743-44 (8th Cir. 2002) (upholding district court entry of summary judgment on claims for civil penalties against a claims administrator because "control over claims under [a] policy . . . did not transform it into the Plan Administrator"); *Fenner v. Favorite Brand Int'l*, 25 F. Supp. 2d 870, 874 (N.D. Ill. 1998) ("[T]he term 'claims administrator' is not synonymous to 'plan administrator,' and not all claims administrators are concurrently plan administrators.). Accordingly, Myers's argument that NCAS was the plan administrator is unpersuasive. Since Carroll acted as both employer and plan administrator, Carroll, through NCAS as its third-party administrator, had forty-four days from Myers's termination to send her a COBRA notice. Accordingly, Carroll, through NCAS, had until March 22, 2009—forty-four days from Myers's February 6, 2009 termination—to mail Myers her COBRA notice.

    **2.    NCAS Acted in Good Faith**

Though NCAS has provided evidence that it sent a COBRA notice to Myers's residence March 27, 2009—five days late—via U.S. Postal Service first class mail, Myers claims that she never received this notice. Thus, Myers asserts that NCAS is liable for statutory penalties of $110 per day through July 20, 2009, when NCAS mailed her a second COBRA notice. NCAS Reply at 6.

Although §1166(a)(4) does not specify the steps needed to notify plan participants of their right to continued coverage, courts have generally held that a good faith attempt to comply with a reasonable interpretation of the statute is sufficient. *See, e.g.*, *Roberts v. Nat'l Health Corp.*, 963 F. Supp. 512 (D.S.C. 1997), *aff'd* 133 F.3d 916 (4th Cir. 1998) (holding that an employee's protestation that he or she did not receive a COBRA notification letter is not enough to raise a genuine and material issue); *Crotty v. Dakotacare Admin. Servs.*, 455 F.3d 828, 830 (8th Cir. 2006); *Torres-Negron v. Merck & Co.*, 488 F.3d 34, 45 (1st Cir. 2007); *Degruise v. Sprint Corp,* 279 F.3d 333, 336 (5th Cir. 2002) ("[E]mployers are required to operate in good faith compliance with a reasonable interpretation of what adequate notice entails."); *Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1383-84 (10th Cir. 1997). Thus, several courts including the Fourth Circuit have found that the statute does not require actual notice. Instead, employers comply with § 1166(a) when they send COBRA notices by means reasonably calculated to reach the recipient. *See Crotty,* 455 F.3d at 830 (citing cases). The Fourth Circuit has affirmed that employers are in compliance with § 1166(a) when they send COBRA notices via first class mail to an employee's last known address. *See Roberts*, 963 F. Supp. at 514.

In this case, the evidence reflects that Defendants developed in good faith a procedure that caused a COBRA letter to be sent to Myers by first class mail at her last known address. Carroll used a reliable system of notification and has business records indicating that a letter was sent on March 27, 2009. As this Court has previously noted, Myers's contention that she did not receive the first COBRA notification letter in the face of such evidence is not sufficient to raise a genuine issue of material fact. *See S. Md. Hosp. Ctr. v. Corley*, 6 F. Supp. 2d 461, 466 (D. Md. 1998) (agreeing with *Roberts*, 963 F. Supp. 512 (D.S.C. 1997)). Notably, in her Opposition brief, Myers concedes that there is no evidence that NCAS exercised bad faith when sending out her COBRA notices. Myers Opp'n to NCAS at 8. Thus, NCAS has met its burden of proving that it sent Myers a COBRA notice on March 27, 2009. Since NCAS had until March 22, 2009

to send Myers a timely CORBA notice, the maximum statutory penalty this Court could impose on NCAS is $550 ($110 per day for five days).

   3.   **Prejudice**

NCAS argues that Myers is not entitled to recover any portion of the civil penalty provided under ERISA §1132(c)(1) because Myers was not prejudiced by the delayed COBRA notice. As the Fourth Circuit has held, while the lack of prejudice does not bar the imposition of penalties, courts consider the extent or lack of prejudice as a factor in exercising their discretion to impose a penalty. *Faircloth v. Lundy Packing Co*., 91 F.3d 648, 659 (4th Cir. 1996). Though Myers argues in her Opposition brief that she was prejudiced "to the extent that she incurred out of pocket medical expenses incurred during the period she was without COBRA coverage," Myers admits in her deposition that she did not have any medical conditions that merited seeing a doctor during the relevant time period. Myers Opp'n to NCAS at 8; NCAS Reply, Ex. A at 177-78. Notably, the fact that Myers never elected to take advantage of COBRA coverage even after she admits that she received notice of her rights is further evidence that Myers was not prejudiced by the five day delay. Accordingly, because Myers did not suffer any prejudice as a result of receiving the late COBRA notice, this Court declines to impose any statutory penalty on NCAS.

**B.   ARRA Notice**

The American Recovery and Reinvestment Act of 2009 requires that COBRA notices provided to individuals who are eligible to receive ARRA's COBRA premium subsidy include a disclosure of the ARRA subsidy. ARRA § 3001(a); *Middlebrooks v. St. Coletta of Greater Wash., Inc*., 2010 U.S. Dist. LEXIS 90752, at *9-10 (E.D. Va. Sept. 1, 2010). Under ARRA, employers are required to notify eligible individuals of the subsidy by providing, among other things, a prominent description of the availability of the premium reduction. ARRA § 3001(a)(7). The notice requirement can be satisfied by "inclusion of a separate document with

the notice [required by ERISA]." *Id*. at § 3001(a)(7)(A)(iii). Though Myers contends that NCAS failed to provide her with this ARRA notice, NCAS has provided evidence that it did, in fact, include an ARRA notice in the first COBRA notification it sent her, as well as in the second and third notice. NCAS Summ. J. Mem. Exs. B, D & E. Given that the evidence as to NCAS's procedures for sending out COBRA notices and ARRA notices is the same, there is no genuine issue of material fact that NCAS acted in good faith and included an ARRA notice when it sent her a COBRA notice on March 27, 2009.

Thus, NCAS has met its burden of proving that it sent Myers a COBRA notice on March 27, 2009, and that Myers did not suffer any prejudice as a result of receiving this COBRA notice five days late. NCAS has also met its burden of proving that it sent Myers an ARRA notice. Accordingly, Defendant NCAS's motion for summary judgment as to Myers's ERISA claims (Counts II and III) is granted.

## CONCLUSION

For the reasons stated above, Defendant Carroll's Motion for Summary Judgment (ECF No. 30) and Defendant NCAS's Motion for Summary Judgment (ECF No. 29) are GRANTED.

A separate Order follows.

Dated:    January 6, 2011            /s/_____
                                      Richard D. Bennett
                                      United States District Judge